**DEPOSIT GUARANTY BANK & TRUST CO. v. UNITED STATES.**

No. 7849.

District Court, S. D. Mississippi, Jackson Division.

Jan. 27, 1943.

Stokes V. Robertson, of Jackson, Miss., for plaintiff.

Toxey Hall, U. S. Atty., John W. Savage, Asst. U. S. Atty., and Roy Goss, Bureau of War Risk Litigation, all of Jackson, Miss., for defendant.

MIZE, District Judge.

This is an action brought under the provisions of Section 19 of World War Veterans' Act 1924, as amended, 38 U.S.C. A. § 445, for the recovery of total permanent disability benefits in monthly instalments of $25 each, commonly referred to as "automatic insurance", as provided for by Section 401 of the War Risk Insurance Act of October 6, 1917, as amended, 41 Stat. 374, which, in its material part, is as follows:

Section 401—"Any person in the active service on or after the 6th day of April, 1917, and before the 11th day of November, 1918, who, while in such service, and before the expiration of one hundred and twenty days after October 15, 1917, or one hundred and twenty days after entrance into or employment in the active service, becomes or has become totally and permanently disabled, or dies or has died, without having applied for insurance, shall be deemed to have applied for and to have been granted

insurance, payable to such person during his life in monthly installments of $25 each."

The ward, Louis C. Wright, enlisted for military service in the United States Army on June 15, 1917, and was honorably discharged therefrom on February 1, 1918, on a surgeon's certificate of disability because of epilepsy grand mal, and which certificate further had on it in the opinion of the surgeon that this condition exceed prior to enlistment; the ward saw overseas service from July 30, 1917, to January 7, 1918, as was reflected by the records of the Adjutant General's Office, and the soldier did not apply for insurance and, of course, was granted none other than as was provided by the section hereinbefore referred to.

■ Section 401, above referred to, is clear that if a soldier entered the armed services within the period specified in good health, or only partially disabled, who thereafter became totally disabled while in service and within the one hundred and twenty days, then he is entitled to the automatic insurance.

The facts in this case show that the ward was less than eighteen years of age at the time of his enlistment, but falsely represented himself, in all probability, to be eighteen. As a matter of fact, he was slightly under eighteen.

He enlisted on June 15, 1917, and at that time undoubtedly was partially disabled. While an infant of tender years it was discovered that he was afflicted with epilepsy petit mal, and suffered with this affliction until he was some nine years old. About that date an operation was performed, and apparently he had no other attacks until he was about sixteen years of age. However, it is shown that he was given bromides from time to time, which seemed to control his condition. A short time prior to entry into the service he became engaged in an altercation in which he severely slashed another boy with a razor, inflicting a rather severe injury upon the other boy across the face. Almost immediately thereafter he was adjudged a lunatic upon a hearing before a jury. He was admitted to the Insane Hospital April 24, 1917, where he remained until May 30, 1917, when he voluntarily walked off, went home, reported to his mother that he had caught the train south and was not going back. The only effort to obtain his return to the Hospital is re-

flected by a notation upon one of the Hospital records to the effect that Doctor Little, the family physician, had been 'phoned by the authorities of the Asylum and had stated to him that they would defray his expenses back to the Asylum if he would bring him back. He was not carried back, and no other effort was made to further confine him in the Asylum. He thereupon re-entered school, and a day or so before his enlistment in the army he and another boy left school, went to New Orleans, and entered the service. Some schoolmates reported his departure to his parents.

From the date of his discharge from the army he has not followed any substantially gainful occupation, and has not been able to follow continuously any substantially gainful occupation since that date.

The Government undertook to rehabilitate him, and gave him training at Tulane University, where he was discharged by the authorities for his inability to get along with his associates. Thereafter, further training was attempted to be given him at Mississippi State College, where he was discharged for substantially the same reason. At no time did he ever show any likelihood of being able to follow any gainful occupation after his discharge. It is clear now that at the date of his discharge he was totally and permanently disabled. The discharge, however, stated that he was disabled to the extent of one-third, which statement was justified by the facts appearing at that time. But, taking the testimony in this case as a whole, it is now clear that never at any time since his discharge has he been able to do any substantial work.

His is one of the cases that did not yield to treatment, but progressively grew worse. There are instances where this ailment may be controlled to the extent that a party at intervals can do substantial work, while others fail to respond to any kind of treatment to the extent that it can be controlled. The evidence in this case shows that such was the unfortunate condition of this young man. He co-operated to the extent that he wanted hospitalization, always took hospitalization when offered him, and was given every known treatment that the Government could offer. The proof shows conclusively that he failed to respond.

■ The legal questions presented are more difficult. An adjudication of insanity by a jury raises a rebuttable pre-

sumption that the party is insane and incapable of performing work or making con-tracts. This presumption is a rebuttable one, and while the short period elapsing between the date of his adjudication and the date of his claim to restoration is a strong factor against such claim of his restoration to sanity or ability to work, yet, all of the facts are required to be taken into consideration.

The application for admission to the State Insane Asylum was signed by Doctor J. P. Watson, who was shown to be a member of the jury which adjudicated the boy insane. This application is made upon a printed form with blanks to be filled in by the certifying physician, and in it as printed reads as follows: " * * * have examined Louis Wright, a resident of said County, and find him to be insane."

The word "insane" mentioned herein was a printed word, and Doctor Watson in filling out the application erased it and inserted in pen and ink the following: "Feeble minded—epileptic."

■ There is some doubt as to the validity of this adjudication of insanity, for the reason that the original file from the Chancery Court of Copiah County, introduced in evidence, fails to show that the lunatic, the soldier afterwards, was summoned, as required by the laws of Mississippi, to answer to this charge of lunacy. There was a summons issued for him, but the return of the officer fails to show that it was served upon him personally, as required by law, and utterly fails to show that a copy was served upon his parent or guardian, as is required by the laws of Mississippi when a minor is involved. However, if full weight should be given to the judgment adjudicating him a lunatic, I am of the opinion that the evidence clearly shows that he was partially restored to sanity prior to the time of his enlistment in the army. I am not overlooking the strong presumption that arises against him, and great weight is given to that presumption, but, even in that light, the evidence shows rather clearly that at the date of his entry into the army he was not a lunatic, nor was he totally disabled, but he was partially disabled, to the extent that he was suffering with epilepsy petit mal, but, in all other respects, strong physically, that his mind was not impaired to the extent that he did not know how to transact business as well as the average boy at that age.

■ The general rule is that an adjudication of insanity is generally admissible as evidence of insanity at the time of the finding, and substitutes for the presumption of sanity a presumption of insanity, which continues until the contrary is shown.

In this instance the plaintiff has overcome that presumption, and the evidence shows rather clearly, certainly by a preponderance, that he was only partially disabled when he entered the service.

■ Judgments of courts must be rendered upon evidence and not upon conjecture. Evidence of witnesses, undisputed, sworn to, and not so unreasonable as to be unbelievable, must be taken by the trier of facts as true. Applying that rule, this case shows the undisputed testimony of Doctor Little that, in his opinion, the boy was suffering with epilepsy petit mal, which had been controlled since he was nine years of age by the use of bromides, up until the time of his entry into the army. The testimony of the boy's mother is that he was a normal child, bright, and did well in school, with the exception of two years, due to causes beyond his control and not pertinent here.

The only evidence that disproves this is the adjudication of insanity, which matter has heretofore been disposed of. The question then remains as to whether or not he became totally disabled while in service within the one hundred and twenty days.

■ As hereinbefore stated, the evidence shows with reasonable certainty that he was totally disabled, and permanently, upon the date of his discharge. The only inference, therefore, that can be drawn is that he became totally and permanently disabled within the one hundred and twenty days, and while in service, and is, therefore, entitled to recover.

### Findings of Facts and Conclusions of Law.

The Court makes the following findings of facts and conclusions of law:

(1) That Louis C. Wright entered the military service of the United States on June 15, 1917, and was honorably discharged therefrom on February 1, 1918.

(2) That at the time of the enlistment was partially and permanently disabled, at that time being afflicted with epilepsy petit mal, but which was permanent, but only partially disabling.

372

(3) That on September 9, 1917, he became totally and permanently disabled from following continuously any substantially gainful occupation, and has so remained, and will remain permanently totally disabled.

(4) That the Government has offered and endeavored to rehabilitate him, and he co-operated to the best of his ability, but medical aid has failed to improve his condition to the extent that there could be any hope of his recovery.

(5) That on the date of the discharge of the veteran from the army it did not then reasonably appear that his disability was total, but subsequent developments have shown very clearly that, as a matter of fact, the veteran was totally and permanently disabled on the date of his discharge.

· Conclusion of Law.

Upon the foregoing findings of fact, the Court concluded as a matter of law that Section 401 of the War Risk Insurance Action of October 6, 1917, was and is applicable, and that automatic insurance was granted him in the sum of twenty-five dollars per month.

Let the motion of the Government for a judgment be denied, and judgment entered for the plaintiff in accordance herewith.

See, also, 47 F.Supp. 371.

James D. Shaw, Walter D. Corrigan, Sr., Kenneth F. Webster, and Francis H. Parson, all of Milwaukee, Wis., for Eline's, Inc.

Malcolm K. Whyte and Herman E. Friedrich, of Lecher, Micahel, Whyte & Spohn, all of Milwaukee, Wis., for Lakeside Laboratories, Inc., and another.

Charles B. Quarles (of Lines, Spooner & Quarles), of Milwaukee, Wis., for Gaylord Container Corporation.